UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| PATRICIA H.,[1]<br><br>Plaintiff,<br><br>v.<br><br>FRANK J. BISIGNANO, Commissioner of Social Security Administration,[2]<br><br>Defendant. | ) | Case No. 3:25-cv-30053-CLM |

MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS AND DEFENDANT'S MOTION TO AFFIRM THE COMMISSIONER'S DECISION
(Docket Nos. 8 & 10)

MORGAN, U.S.M.J.

Patricia H. ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g) and 28 U.S.C. §1361 seeking review of a final decision of the Commissioner of the Social Security Administration denying her application under Sections 216(i) and 223(d) of the Social Security Act for disability insurance benefits for the period from October 16, 2020, through December 31, 2021 (Dkt. No. 1). Plaintiff contends that the Administrative Law Judge's ("ALJ") decision was not supported by substantial

---

1 In the interest of privacy, this Report and Recommendation uses only the first name and first initial of the last name of the non-governmental party in this case. *See S.R. v. Soc. Sec. Admin.*, Civil No. 24-12335-LTS, 2025 WL 815122, at *2 (D. Mass. Mar. 6, 2025) ("Use of [the] initial[ ] protects the claimant's privacy while still ensuring public access to the [c]ourt's reasoning and decision.").

2 Pursuant to Fed. R. Civ. P. 25(d), Frank J. Bisignano, Commissioner of the Social Security Administration, is automatically substituted for Leland Dudek, the former Acting Commissioner.

evidence and relied on an incorrect legal standard, and, as a result, seeks reversal and remand. Before the court are Plaintiff's motion for judgment on the pleadings (Dkt. No. 8) and the Commissioner's motion for an order affirming the decision (Dkt. No. 10). The parties have consented to this court's jurisdiction (Dkt. No. 14). *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73. For the reasons set forth below, the court GRANTS the Commissioner's motion and DENIES Plaintiff's motion. The Clerk's Office is directed to close this case on the court's docket.

## I. RELEVANT FACTUAL BACKGROUND

On or about April 12, 2017, Plaintiff filed an application seeking Social Security disability insurance benefits ("disability benefits") based on a claim that her disability made her unable to work beginning April 28, 2016 (A.R. 81).[3] During the pendency of her application, Plaintiff was diagnosed with lupus by rheumatologist Susan Y. Ritter, M.D., Ph.D., which then served as part of the basis of her disability application (A.R. 87-88, 250).[4] On April 29, 2020, an ALJ found Plaintiff disabled for a closed period from April 28, 2016, through June 10, 2019—the full period for which Plaintiff sought benefits— based in part on findings that chronic pain and fatigue would cause Plaintiff to be off task approximately twenty five percent of the workday (A.R. 81-93). The ALJ found that Plaintiff's conditions

---

[3] All citations to "A.R." refer to the administrative record, which appears at docket number seven of this case. The page numbers were assigned by the Social Security Administration and appear in the lower righthand corner of each page.

[4] Plaintiff also claimed that she suffered severe impairments from episodic pericarditis, anemia, Raynaud's Syndrome, and a hiatal hernia. Because Plaintiff only challenges the ALJ's evaluation of her lupus symptoms in this case, the court limits its discussion of the evidence accordingly.

had medically improved to the point that she could sustain full-time work by June 11, 2019, when she returned to working approximately 37 hours per week as a victim-witness advocate for the Berkshire County District Attorney's Office (A.R. 87).

Plaintiff switched from in-person work to remote work in March 2020 because of the COVID-19 pandemic (A.R. 361). Plaintiff was required to return to the office around August 2020 (*id.*). Plaintiff reported that, after returning to the office, she had trouble keeping up with her job responsibilities due to her condition, and her employment was ultimately terminated for falling asleep on the job (A.R. 23, 45-46, 48, 245, 257, 361; Dkt. No. 8-1, at 8).

Plaintiff protectively filed the instant application for disability benefits with the Social Security Administration on February 7, 2022, alleging disability beginning on October 16, 2020 (A.R. 66-67, 198-99). Because Plaintiff was only insured for disability benefits through December 31, 2021, the period under consideration by the ALJ was limited to October 16, 2020, through December 31, 2021 (A.R. 17-18).

A. Medical Records

Prior to and throughout the period under consideration, Plaintiff primarily received care from her primary care physician, Amy Campion, D.O. In August 2020, when required to return to work in-person and two months before the alleged onset date, Plaintiff expressed concern regarding workplace exposure to COVID-19 because of her lupus diagnosis (A.R. 361). At the time, Dr. Campion noted that

Plaintiff's lupus was "not currently active" and that she was not taking a disease-modifying agent (*id.*). Nevertheless, the doctor provided documentation supporting either remote work or a leave of absence due to the "increased risk for poor outcome" of a COVID-19 infection, based on Plaintiff's lupus diagnosis and age (*id.*).

In September 2020, Plaintiff sought treatment for epigastric pain and gastrointestinal complaints (A.R. 490-93). During a follow-up in October, Plaintiff reported fatigue and requested laboratory testing (A.R. 495-96). In December 2020, Plaintiff reported fatigue and pain in her arms and legs and questioned whether those symptoms were related to lupus (A.R. 500). Dr. Campion, who did "not have records for review," described Plaintiff's symptoms as "a complex constellation . . . which may or may not be related to lupus" and noted that Plaintiff had never used an immunosuppressive agent for lupus, instead managing her symptoms with over-the-counter pain management medications (*id.*). Plaintiff expressed interest in re-establishing rheumatology care, so Dr. Campion provided a rheumatology referral and strongly encouraged Plaintiff to obtain the medical records from her prior rheumatologist (A.R. 504). There is no evidence in the record of Plaintiff obtaining these records or receiving care from a rheumatologist during the insured period (A.R. 23, 26).

Following the end of the insured period, in October 2022, Plaintiff returned to Dr. Campion, complaining of chronic pain and fatigue, among other issues (A.R. 528-29). Dr. Campion and Plaintiff discussed another rheumatology referral but decided to hold off (A.R. 528).

During an office visit on February 1, 2023, Dr. Campion documented chronic complaints including abdominal pain, shortness of breath, weakness, and fatigue, and opined that "it is possible that all of her symptoms perhaps can be explained by an autoimmune condition such as lupus" (A.R. 532). Dr. Campion noted that Plaintiff was unable to work and recorded in her notes that she would "provide a note for disability stating that [Plaintiff] is currently 100% disabled" (*id.*). A few days later, Dr. Campion wrote the note, opining that Plaintiff remained disabled and unable to work "due to an ongoing medical issue" that had significantly worsened over the prior two to three years (A.R. 249).

In October 2023, Plaintiff again reported debilitating fatigue and difficulty predicting her daily functional capacity, but the medical records note that she had "not had any ongoing rheumatologic care" (A.R. 540). Dr. Campion again urged Plaintiff to seek rheumatologic care (*id.*). Dr. Campion subsequently wrote a letter stating that Plaintiff suffered from "crippling fatigue and weakness of limbs" and requesting that she be excused from jury duty (A.R. 436).

B. <u>State Agency Consultants</u>

On initial review of Plaintiff's application for disability benefits, Elaine Hom, M.D., reviewed Plaintiff's medical records and completed a residual functional capacity assessment on August 5, 2022 (A.R. 60-65). Dr. Hom acknowledged Plaintiff's reports of fatigue, weakness, shortness of breath, and chronic pain (A.R. 60). In assessing Plaintiff's residual functional capacity, Dr. Hom opined that Plaintiff has some exertional and postural limitations: she could occasionally lift

and carry twenty pounds and frequently lift and carry ten pounds; stand and walk six hours in an eight-hour day; sit six hours in an eight-hour day; and climb, balance, stoop, kneel, crouch, and crawl occasionally (A.R. 62-63). Dr. Hom found that Plaintiff did not have any manipulative, visual, or communicative limitations, but should avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, vibration, hazards, or fumes, odors, dusts, or gases (A.R. 63).

On reevaluation, Alice Truong, M.D., reviewed Plaintiff's medical records and provided her opinion as to Plaintiff's residual functional capacity on February 8, 2023. She similarly concluded that Plaintiff could perform a range of light work with the same exertional and environmental limitations noted by Dr. Hom (A.R. 68-74).

C. Administrative Hearing

1. *Plaintiff's Testimony*

At the January 17, 2024, hearing, Plaintiff testified regarding fatigue and other limitations she attributed to lupus (A.R. 44-53). Plaintiff testified that she went back to work in June 2019, at the end of her previous closed period of receiving disability benefits, because it was an entry-level, non-physical job, and she "thought it would be a lot easier than other jobs [she had] had" (A.R. 44). She testified she worked there from June 2019 to around August 2020, at which point she felt unable to keep up with the job (A.R. 45). She struggled with her fatigue, fell asleep at work (*id.*), and was eventually fired (A.R. 46). Plaintiff testified that she sought work in the months following her termination (*id.*).

Plaintiff attributed her fatigue to lupus (A.R. 48). Plaintiff testified that her fatigue had worsened over time, was sometimes crippling, and particularly impacted her legs (*id.*). She testified that she needed to rest frequently throughout the day due to her fatigue, making it difficult to complete daily chores (A.R. 52). When asked if she thought she could work as of the date of the hearing, she testified that she would be too drowsy to work from a chair for six hours in an eight-hour day (A.R. 53).

Plaintiff further testified as to the lack of recent treatment records. She explained that her rheumatologist offered her immunosuppressant drugs, which she rejected because "they don't always help," and instead relied on "over the counter and other medications" (A.R. 50). She stated that she was also hesitant to take immunosuppressant drugs because she already had a compromised immune system and had a friend with lupus who was on immunosuppressants and died from COVID-19 (A.R. 51). Plaintiff mostly tried to stay inside during the pandemic, even missing her mother's funeral, due to fears of infection (*id.*). According to Plaintiff, she still spent most of her time at home due to her compromised immune system (A.R. 52).

At the conclusion of Plaintiff's testimony, the ALJ directed Plaintiff to provide any other records pertaining to her lupus since the alleged onset date of October 16, 2020 (A.R. 53-54).

2. *Vocational Expert's Testimony*

The ALJ first asked Warren Maxim, the vocational expert, to consider a hypothetical individual of Plaintiff's age, education, and work experience, who could lift and carry ten pounds occasionally and less than ten pounds frequently, stand and walk for two hours in an eight-hour day, sit for a total of six hours, engage in only occasional postural activities (including climbing, balancing, stooping, kneeling, crouching, and crawling), and must avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, vibration, hazards or fumes, odors, dust, or gases (A.R. 54). The vocational expert testified that these limitations would not eliminate Plaintiff's past work as generally described in the Dictionary of Occupational Titles, but they would eliminate her job as she actually performed it (A.R. 55). The ALJ then asked the vocational expert to consider the same hypothetical individual, but with the ability to sit reduced to four hours total per workday (*id.*). The vocational expert indicated that such a limitation would eliminate all past work, as well as all other work in the national economy, and that there would not be any transferable skills for the hypothetical individual (*id.*). Finally, the vocational expert testified that all work would be eliminated if the hypothetical individual was off task fifteen percent of the time or missed work on average two days per month (*id.*).

At the conclusion of the vocational expert's testimony, the ALJ again reminded Plaintiff to provide any other records pertaining to her lupus (A.R. 56).

## II. THE ALJ'S DECISION

On April 23, 2024, the ALJ issued a decision denying Plaintiff's claim (A.R. 18-28). The ALJ conducted the requisite five-step sequential analysis set forth in the regulations promulgated by the Social Security Administration ("SSA"). *See* 20 C.F.R. § 404.1520(a)(i)-(v); 20 C.F.R. § 416.920(a)(4)(i)-(v). At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity between October 16, 2020, and December 31, 2021, the date on which she was last insured (A.R. 19). At the second step, he found that Plaintiff's severe impairments included lupus, venous insufficiency, metatarsalgia of left forefoot, neuroma of left third intermetatarsal space, small hiatal hernia, and minimal subsegmental atelectasis (A.R. 20). At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment (A.R. 21). Before considering step four, the ALJ found that, for the entire period at issue, Plaintiff had the residual functional capacity to:

> perform sedentary work as defined in 20 CFR 404.1567(a) except she can stand and walk 2 hours in an 8 hour day; she can sit 6 hours in an 8 hour day; she can climb, balance, stoop, kneel, crouch, and crawl occasionally; she can have no concentrated exposure to extreme cold, extreme heat, wetness, humidity, vibration, hazards, or fumes, odors, dusts, or gases.

(A.R. 22). At step four, the ALJ determined that Plaintiff was capable of performing past relevant work as a community relations representative and sales and promotions agent, neither of which required the performance of work-related

activities precluded by the claimant's residual functional capacity (A.R. 27). Because the ALJ determined that Plaintiff had the residual functional capacity to do her past relevant work, the ALJ found she was not disabled, and the analysis did not proceed to the fifth and final step (A.R. 27).

## III. STANDARD OF REVIEW

The district court may enter a judgment affirming, modifying, or reversing the final decision of the Commissioner, with or without remanding for rehearing. *See* 42 U.S.C. § 405(g). Judicial review is limited to determining "'whether the [ALJ's] final decision is supported by substantial evidence and whether the correct legal standard was used.'" *Coskery v. Berryhill,* 892 F.3d 1, 3 (1st Cir. 2018) (quoting *Seavey v. Barnhart,* 276 F.3d 1, 9 (1st Cir. 2001)). The court reviews questions of law *de novo*, *id.*, but "the ALJ's findings [of fact] shall be conclusive if they are supported by substantial evidence, and must be upheld 'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion,' even if the record could also justify a different conclusion." *Applebee v. Berryhill*, 744 F. App'x 6, 6 (1st Cir. 2018) (per curiam) (quoting *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222-23 (1st Cir. 1981)). "Substantial-evidence review is more deferential than it might sound to the lay ear: though certainly 'more than a scintilla' of evidence is required to meet the benchmark, a preponderance of evidence is not." *Purdy v. Berryhill*, 887 F.3d 7, 13 (1st Cir. 2018) (quoting *Bath Iron Works Corp. v. U.S. Dep't of Labor*, 336 F.3d 51, 56 (1st Cir. 2003) (internal quotation marks omitted)). In applying the substantial

evidence standard, the court must be mindful that it is the province of the ALJ, and not the courts, to determine issues of credibility, resolve conflicts in the evidence, and draw conclusions from such evidence. *See Applebee*, 744 F. App'x at 6. That said, the ALJ may not ignore evidence, misapply the law, or judge matters entrusted to experts. *See Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

## IV. ANALYSIS

Here, Plaintiff presents four separate claims of error. First, she contends that the ALJ failed to properly evaluate the opinion evidence. Second, she argues that the ALJ failed to consider certain objective medical evidence and thus the ALJ's decision is not supported by substantial evidence. Third, she contends that the ALJ mischaracterized the evidence. Finally, Plaintiff alleges that the ALJ imposed the incorrect evidentiary standard of proof. The court addresses each of Plaintiff's theories in turn.

### A. The ALJ Properly Evaluated the Opinion Evidence

In her memorandum, Plaintiff contends that the ALJ failed to adequately address Plaintiff's lupus symptoms by failing to "reasonably cite [the] consistency or supportability factors [of 20 C.F.R. § 404.1520c] in his decision regarding [Plaintiff's] primary symptom: fatigue," leaving the court "with mere speculation as to the ALJ's bases for rejecting the opinion of the treating internist [Dr. Campion] and . . . the adequacy of the non-examining DDS internists' [Dr. Hom's and Dr. Truong's] opinions . . . " (Dkt. No. 8-1, at 14). For his part, the Commissioner argues

that the ALJ adequately explained his reasons for not adopting Dr. Campion's opinions, as well as his reasoning for accepting, in part, the opinions of Drs. Hom and Truong (Dkt. No. 11, at 9-13).[5]

"Although it is well-established that an ALJ need not articulate precisely his reasoning for rejecting a treating source statement on a claimant's residual functional capacity, it is similarly well-established that an ALJ must articulate his reasoning sufficient for a reviewing court to achieve meaningful appellate review" (Dkt. No. 8-1, at 13) (citing *Harrison v. Saul*, Civil No. 20-10295-LTS, 2021 WL 1153028, at *5 (D. Mass Mar. 16, 2021)). In determining a claimant's residual functional capacity (RFC), an ALJ "must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *Harrison*, 2021 WL 1153028, at *5 (quoting SSR 96-8p, 1996 WL 374184, at *7 (S.S.A. July 2, 1996)). In making this determination, "the ALJ must consider the following factors: supportability, consistency, relationship, specialization, and other factors," the most important of which are supportability and consistency. *Id. (*citing 20 C.F.R. §§ 404.1520c(c)(1)-(5), 416.920c(c)(1)-(5); *Nicole C. v. Saul*, C.A. No. 19-127JJM, 2020 WL 57727, at *4 (D.R.I. Jan. 6, 2020)). "Supportability is the degree to which a

[5] In his Memorandum, the Commissioner raises the question of whether Dr. Campion's letter excusing Plaintiff from jury duty constitutes a "medical opinion" or should be considered "other medical evidence," but states that the ALJ "reasonably erred on the side of caution and treated" the letter as a medical opinion (Dkt. No. 11, at 8-9). (*id.*). Because the Commissioner does not ask the court to find that the ALJ erred in treating the letter as a medical opinion, the court does not consider the question.

provider supports their opinion with relevant, objective medical evidence and explanation, and consistency is the degree to which a provider's opinion is consistent with the evidence of other medical and non-medical sources in the record." *Oakes v. Kijakazi*, 70 F.4th 207, 212 (4th Cir. 2023) (citing 20 C.F.R. § 404.1520c(c)(1)-(2)).

1. *Dr. Campion's Opinion*

Although Plaintiff complains of an "absence of §[ ]404.1520c factors" (Dkt. No. 8-1, at 14), the ALJ did in fact properly consider Dr. Campion's opinion (A.R. 25). As the ALJ stated:

> [Dr. Campion's] letter states [Plaintiff] had crippling fatigue and weakness of limbs. However, the evidence on record does not support these limitations. The claimant has no rheumatologic treatment during the period at issue. Treatment records from her primary care source reflect[] the claimant declined multiple referrals to a rheumatologist. The claimant's lack of treatment does not support the statement that she has "crippling" symptoms. There is also no evaluation of her legs indicating objective support of weakness . . . . Therefore, the opinion of Dr. Campion is not supported by or consistent with the record and is not persuasive (A.R. 25).

The court is not, as Plaintiff purports, "left with mere speculation as to the ALJ's bases for rejecting" Dr. Campion's opinion (Dkt. No. 8-1, at 14). The ALJ explicitly found that Dr. Campion's opinion was unsupported by and inconsistent with evidence that Plaintiff was not actively treating her lupus, declined referrals to a rheumatologist, and found relief from over-the-counter medications (A.R. 25). The record shows that Dr. Campion did not actively treat Plaintiff's lupus, even noting that she did "not have records for review," and that Plaintiff's symptoms "may or

may not be related to lupus" (A.R. 500). A rational factfinder could find Dr. Campion's statement that Plaintiff's lupus "causes crippling fatigue and weakness of limbs" (A.R. 436) was inconsistent with her prior notes, conclusory, and otherwise devoid of objective medical evidence, and therefore unsupported by and inconsistent with the record. *See Darling v. Kijakazi*, No. 22-35594, 2023 WL 4103935, at *1 (9th Cir. June 21, 2023) (affirming ALJ's supportability and consistency findings where the "opinion was internally inconsistent, as well as inconsistent with [the plaintiff's] work history and reports to other medical sources").

Moreover, the record reflects that the ALJ conducted a detailed review of the medical evidence and Plaintiff's own testimony (A.R. 22-27). *See Marshall v. Bisignano*, 1:24-cv-11431-JEK, 2025 WL 2207245, at *5-7 (D. Mass. Aug. 4, 2025) (finding ALJ's in-depth discussion of pertinent evidence supportive of his finding of medical opinion as unsupported and inconsistent). The lack of objective medical support for Dr. Campion's opinion was a factor the ALJ could not ignore. The court thus concludes that the ALJ fulfilled his obligation to explain his consideration of both the consistency and supportability factors when explaining why he was not persuaded by Dr. Campion's opinion.

2. *Dr. Hom's and Dr. Truong's Opinions*

Plaintiff further argues that the ALJ failed to explain why he found the opinions of Drs. Hom and Truong partially persuasive and posits that these opinions are inadequate because they are "not well justified" (Dkt. No. 8-1, at 14-16). The court finds that the ALJ appropriately considered the opinions of DDS

examiners Drs. Hom and Truong. The ALJ noted "[t]he overall evidence of record, including . . . reported fatigue and pain from [l]upus . . . warrant a restriction to sedentary work" with postural, environmental, and pulmonary limitations, as opined by Drs. Hom and Truong (*id.*). Both doctors reviewed Plaintiff's medical records and considered Plaintiff's symptoms in making their opinions (*see* A.R. 61, 63-64, 72). The ALJ noted that the doctors' opinions were "consistent with the record," and that the Plaintiff's conditions, including fatigue from lupus, "support these limitations" (A.R. 26). The court thus finds that the ALJ adequately explained his application of the consistency and supportability factors in assessing the opinions of Drs. Hom and Truong and concluding that he was partially persuaded by them.

Plaintiff takes specific issue with both doctors' use of the phrase "some fatigue" (A.R. 63, 72) and implies that this shows that "[t]he DDS reviewing internist[s'] opinions were not well justified by any objective measure" (Dkt. No. 8-1, at 16) (citing *Alcantara v. Astrue*, 257 F. App'x 333, 335 (1st Cir. 2007)). The court disagrees. Dr. Hom's and Dr. Truong's opinions are supported by the objective evidence in the record, including medical records of Plaintiff's symptoms and treatment. Dr. Hom received medical records through June 2022, and cited specific treatment notes for lupus and other conditions from August 2020 through May 2022 (A.R. 61, 63-64). She noted that Plaintiff:

> "[e]xperiences fatigue and [shortness of breath], falls asleep all the time, weakness in arms and legs. can not [sic] stand for a long time. Does not have difficulties with personal care but sometimes lacks the energy. Goes outside

> for short walks. [C]an drive short distance. [L]ikes to read. [D]ifficulties lifting, squatting, bending, standing[ ]. [U]ses reading glasses, can handle money" (*id.*).

Dr. Truong, for her part, cited Plaintiff's history of disability from April 2016 through June 2019, her subsequent period of full-time work from June 2019 to October 2020, and the new alleged onset date of disability in October 2020, from which Plaintiff "had to stop [working] again due to increasing symptoms," and "the reduced ability to sustain sedentary work" (A.R. 69). She noted that "[e]vidence is needed for the time she stopped working in 10/2020 to 12/2021," as "[t]here is plenty of evidence in the prior allowance to support her conditions ongoing" (*id.*). Dr. Truong also cited to records from September 2017 to May 2022 (A.R. 69-70).

Plaintiff does not point to any specific evidence in the record which Drs. Hom or Truong missed. Rather, she seems to contend that Drs. Hom and Truong impermissibly ignored her "uncontradicted reports of marked limitations" at work and in daily life (Dkt. No. 8-1, at 16). But Drs. Hom and Truong both credited Plaintiff's reports in finding that she had some limitations due to her conditions (A.R. 63, 71-72). Further, the fact that Dr. Hom's and Dr. Truong's opinions are consistent with each other does not suggest that they are not well-justified, as Plaintiff suggests (Dkt. No. 8-1, at 17).

B. <u>The ALJ Properly Considered All Available Evidence</u>

Even if the ALJ did not explicitly address every detail in the record, there is no indication that he impermissibly "ignore[d] evidence" here. *See Nguyen*, 172 F.3d at 35. In his decision, he summarized Plaintiff's history of lupus, including her

diagnosis, symptoms ("pain in her arms and legs, and also fatigue"), treatment ("*never* been on an immunosuppressive agent . . . Ibuprofen and Tylenol were used periodically"), and referrals to see a rheumatologist (A.R. 23, 25). He found that, despite the minimal notation of lupus in the record for the period at issue, Plaintiff's "impairment supports a sedentary work capacity given the subjective complaint by the claimant of fatigue and weakness caused by [l]upus" (*id.*, at 24). The ALJ also considered Dr. Campion's treatment notes and her October 23, 2023, letter mentioning Plaintiff's "crippling fatigue and weakness of limbs" (*id.*, at 25). In reviewing the record as a whole, a reasonable mind "could accept it as adequate to support [the ALJ's] conclusion." *Applebee*, 744 F. App'x at 6 (quoting *Rodriguez*, 647 F.2d at 222-23). This court may not reject these findings, as Plaintiff seeks, to reach a different conclusion by relying more heavily on Plaintiff's self-reported symptoms.

Plaintiff further contends that the ALJ relied upon incorrect legal standards in reaching his decision. First, she argues that the ALJ "conflat[ed] the requirement of 'objective' evidence required of a diagnosis with formulating a residual function capacity employing" the § 404.1520c factors when the ALJ noted that "[n]o objective evaluation was performed" at the December 22, 2020, video appointment (Dkt. No. 8-1, at 17). Second, Plaintiff maintains that the ALJ "misapplied the failure to follow prescribed treatment standard" (*id.*, at 18).

As for the first contention, the ALJ remarking that an objective evaluation was not performed does not mean he required such an evaluation. In evaluating Plaintiff's symptoms, the ALJ was required to "consider all of the available

evidence, including [her] medical history, the medical signs and laboratory findings," in addition to Plaintiff's statements about her symptoms. 20 C.F.R. § 404.1529(a). Consideration of objective evaluations, or a lack thereof, falls within the scope of "all of the available evidence." While "[a]n ALJ cannot reject a claimant's statements about the intensity and persistence of pain or about the effect those symptoms have on her ability to do work solely because the objective medical evidence does not substantiate her statements[,] . . . [t]he absence of objective medical evidence supporting a claimant's statements of pain is . . . one factor that the ALJ must consider, and he must consider the statements in the context of all evidence." *Obijo vs. Astrue*, Civil Action No. 11-10472-JLT, 2012 WL 2126879, at *5 (D. Mass. May 7, 2012) (citing 20 C.F.R. § 404.1529(c)(2); SSR 96–7p). And "[i]n determining a claimant's RFC, an ALJ is not required to take a claimant's subjective allegations of pain and functional limitations at face value and may reject them where they are unsupported by the medical evidence, treatment history, and activities of daily living." *Id.* (citing, *inter alia*, *Avery* v. *Sec'y of Health & Human Servs.*, 797 F.2d 19, 22-23 (1st Cir. 1986)) ("In making [an RFC] determination, an ALJ must consider the so-called 'Avery factors,' which are the claimant's daily activities, functional restrictions, non-medical treatment, medications and side-effects, precipitating and aggravating factors, and the nature, location, onset, duration, frequency, radiation, and intensity of the pain.").

Here, the ALJ found that, although Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms . . . , [her]

statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . " (A.R. 23). Plaintiff's symptoms, which she purported to be debilitating, were manageable with over-the-counter medication (*id.*). Although she reported her symptoms were "crippling," she did not seek treatment with a rheumatologist (A.R. 25). In fact, there were no treatment records for Plaintiff's lupus symptoms from December 2020 through the date last insured (A.R. 23). And as the ALJ noted, although Plaintiff did have physical limitations ("chronic fatigue," "long time to shower and bathe," "difficulty with lifting, squatting, bending, standing, reaching, walking, kneeling, talking, stair climbing, and using hands"), she could still complete many daily living activities, including "mak[ing] simple or prepared meals," driving, shopping, and occasionally visiting with a friend (A.R. 23). The court therefore finds that the ALJ properly considered Plaintiff's subjective reports of symptoms in the context of all the available evidence, including the lack of objective medical evidence.

Secondly, Plaintiff contends that the ALJ should not have used Plaintiff's "failure to follow prescribed treatment" as "a negative consistency factor" because she was not prescribed treatment for her lupus, there was no finding that "treatment would restore [Plaintiff's] ability to work," and the ALJ did not determine whether Plaintiff had "good cause for not following the prescribed treatment" (Dkt. No. 8-1, at 18). She argues that, because an assessment of a claimant's failure to follow prescribed treatment follows a finding of disability, the

ALJ implicitly found her disabled (*id.*). Plaintiff further takes issue that "the decision did not address [her] decision to avoid immunosuppressant medications for fear that a reduced immune system put her at great risk for [COVID-19] . . . " (*id.*, at 19).

The court does not agree that the ALJ considered Plaintiff's "failure to follow prescribed treatment," because, as Plaintiff notes, she was not prescribed immunosuppressant agents, and the ALJ did not represent that she was. However, courts have found that, aside from an individual's failure to follow prescribed treatment, an ALJ may also consider "failure to 'seek or pursue regular medical treatment' . . . ." *Dooley v. Comm'r of Soc. Sec.*, 656 Fed. App'x. 113, 119 (6th Cir. 2016). *See Irlanda Ortiz* v. *Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991) (finding that gaps in treatment are evidence that an impairment is not as severe as alleged); *Baez Velez v. Sec'y of Health & Human Servs.*, No. 92-2438, 1993 WL 177139, at *6 (1st Cir. May 27, 1993) (per curiam) (deferring to ALJ's credibility assessment based, in part, upon finding that plaintiff's allegations "were unsupported by [a plaintiff's] 'conservative treatment'"); *Perez Torres v. Sec'y of Health & Human Servs.*, 890 F.2d 1251, 1255 (1st Cir. 1989) (where a plaintiff "sought no regular treatment for his . . . allegedly painful conditions . . . the ALJ was entitled to discount the severity of the pain complaints"). "However, before drawing a negative inference from [such a failure], the ALJ must consider 'any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek

medical treatment.'" *Dooley*, 656 Fed. App'x at 119 (citing Social Security Ruling ("SSR") 96-7p (now rescinded)). *See* SSR 16-3p, 2017 WL 5180304, at *9 ("We will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints.").

During the January 17, 2024, hearing, the ALJ asked about Plaintiff's lack of treatment (A.R. 50). Plaintiff explained that she had rejected her rheumatologist's offer of immunosuppressant drugs because "they don't always help," she already had a compromised immune system, and she had a friend with lupus who was on immunosuppressants who died from COVID-19 (A.R. 50-51). She further testified that she rarely left the house due to her compromised immune system during the pandemic and at the time of the hearing (A.R. 51-52). *See* A.R. 248 (Plaintiff "avoided going to doctors [in 2020 and 2021] because of the pandemic and [her] compromised immune system with lupus").

Plaintiff argues that "the ALJ should have recontacted the treating internist or sought the opinion of an acceptable medical source" to determine whether an immunosuppressant medication would have allowed Plaintiff to return to work and whether it would have put her at a greater risk of contracting COVID-19 (Dkt. No. 8-1, at 19) (citing, *inter alia*, *Heggarty v. Sullivan*, 947 F.2d 990, 997 (1st Cir. 1991) ("Because Social Security proceedings are not adversarial in nature, the Secretary had a duty to develop an adequate record from which a reasonable conclusion can be drawn.")). However, as Plaintiff herself notes, an ALJ is "under no obligation to seek

additional information where there are no obvious gaps in the record, and where there is a complete medical history." *Veiga v. Colvin*, 5 F. Supp. 3d 169, 176 (D. Mass 2014) (citations omitted). The ALJ here noted that Plaintiff "had *never* been on an immunosuppressive agent despite being diagnosed many years ago" and had expressed interest in re-establishing rheumatology care repeatedly, but never followed through (A.R. 23, 25). The ALJ did request any additional records that existed pertaining to Plaintiff's lupus for the insured period, but none were produced (A.R. 53-54, 56).

A claimant's failure to seek care may be attenuated by "the extraordinary circumstance of the COVID-19 pandemic." *Blanca T. v. O'Malley*, Case No. 5:23-cv-00159-SP, 2024 WL 6847881, at *4 (C.D. Cal. Mar. 27, 2024). Plaintiff testified that her failure to seek treatment from a rheumatologist during the insured period was due, in part, to COVID-19. "If this was the only gap in treatment, the pandemic would be adequate explanation for failing to seek treatment. . . . But the other gaps in treatment have no such explanation." *Lydia G. v. Comm'r of Soc. Sec.*, Civ. No. 3:22-cv-00810-CL, 2023 WL 5928627, at *4 n.3 (D. Ore. Sept. 12, 2023) (internal citation omitted). Plaintiff had never taken a disease-modifying agent from her diagnosis in 2017, through the pandemic, until the end of the insured period in 2021. Instead, she managed her symptoms with over-the-counter medications.

Courts have found that "remand based on lack of inquiry into the reasons for a claimant's failure to seek treatment is required only when the ALJ's determination of non-disability relies 'primarily if not exclusively' on a claimant's

failure to seek treatment." *Crenshaw v. Kijakazi*, Civil Action No. 21-00549-B, 2023 WL 2664756, at *15 (S.D. Ala. Mar. 28, 2023) (citations omitted). Here, although the ALJ did consider Plaintiff's failure to seek treatment in denying her disability based on lupus, he did not rely primarily on this failure in his decision. Rather, as discussed, he found that, while Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms . . . the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence" (A.R. 23). Plaintiff's purportedly "crippling" symptoms were manageable with over-the-counter medication, she did not seek treatment with a rheumatologist, there were no treatment records for Plaintiff's lupus symptoms from December 2020 through the date last insured, and, although Plaintiff did have several physical limitations, she could still complete many daily living activities (*id.*, A.R. 25). The failure to seek treatment was merely one aspect of the ALJ's analysis. The court therefore finds that remand based on lack of inquiry is not warranted, and the ALJ properly considered all available evidence.

C. <u>The ALJ Reasonably Characterized the Record</u>

Plaintiff next contends that the ALJ mischaracterized the evidence in denying her claim (Dkt. No. 8-1, at 20). In particular, Plaintiff claims that the ALJ's characterizations of the "frequency of lupus treatment, the break in lupus treatment with her internist, the subsequent absence of treatment for lupus, and in classifying treatment as 'minimal'" (*id.*, at 21), were inconsistent with the evidence presented or ignored other evidence in the record. The record reflects, however, that the ALJ

properly weighed the record evidence, and it is not the place of this court to re-weigh the evidence considered by the ALJ. *Applebee*, 744 F. App'x at 6.

First, Plaintiff claims that the ALJ mischaracterized the frequency of her lupus treatment because her "lupus was described as an 'active' problem at five appointments . . . from September, [sic] 2020 through May, [sic] 2021, and thereafter" (Dkt. No. 8-1, at 21). But this standardized "active problem" list, duplicated throughout Plaintiff's treatment notes, includes several other "active problem" items that appear to be neither ongoing nor problems, such as "routine gynecological examination" and "abnormal finding on imaging" (A.R. 491, 496-97, 501, 505, 508, etc.). Moreover, Dr. Campion's records reflect that Plaintiff's "[l]upus [was] not currently active" in August 2020, within the same treatment note that lists lupus as an "active problem" (A.R. 361-62). "It is the responsibility of the ALJ to weigh competing medical evidence and resolve any conflicts." *San Antonio v. Saul*, 433 F. Supp. 3d 29, 34 (D. Mass. 2020) (citing *Rodriguez*, 647 F.2d at 222). The ALJ did so here (A.R. 22-27). While Plaintiff may not agree with the ALJ's conclusion in weighing the evidence, it does not mean that the ALJ "mischaracterized" the evidence.

Second, Plaintiff asserts that the ALJ mischaracterized her course of treatment, arguing that her medical history does not reflect that her lupus resolved or that she had a break in treatment for her lupus, and that she continued to receive treatment for lupus after her date last insured (Dkt. No. 8-1, at 21). As a basis for these arguments of "mischaracterization," Plaintiff again cites to the fact

that her medical records list her lupus under "active" conditions as evidence that she was receiving "treatment" (*id.*). Again, as the ALJ noted, Plaintiff was not actively treating her lupus with a disease modifying agent, declined referrals to a rheumatologist, and found relief from over-the-counter medications (A.R. 25). Dr. Campion noted that Plaintiff's lupus was "not currently active" as of August 2020, within a treatment note that also listed lupus as an "active problem" (A.R. 361-62). Moreover, although Dr. Campion referred to an "ongoing medical issue" in 2023, she did not directly link the "issue" to lupus (A.R. 249), and in fact, did not even have access to the medical records from Plaintiff's prior rheumatologist (A.R. 504). In addition, although Plaintiff contends that Dr. Campion noted that her "[c]omplex of symptoms may be . . . related [to lupus]" (Dkt. No. 8-1, at 21), the language omitted by Plaintiff reflects that her internist thought her "symptoms . . . may or may not be related to lupus" (A.R. 365), consistent with the ALJ's finding a lack of objective medical evidence supporting Plaintiff's reported symptoms. Thus, the ALJ's assessment of Plaintiff's treatment does not mischaracterize the evidence.

Third, Plaintiff complains that the court is left to "merely guess what factors the ALJ relied upon, if any" in reaching his decision (Dkt. No. 8-1, at 23). According to Plaintiff, the ALJ failed to address "uncontradicted" evidence regarding her symptoms, including the variability of her symptoms, factors that would trigger or relieve her symptoms, and the effect her symptoms had on her daily living. But the ALJ is required to "consider all of the available evidence, including [her] medical history, the medical signs and laboratory findings," in addition to Plaintiff's

statements about her symptoms. 20 C.F.R. § 404.1529(a). As the record reflects, that is precisely what the ALJ did here. He considered all the evidence presented, including Plaintiff's self-reported symptoms, in reaching his conclusion (*see* A.R. 22-27). Despite Plaintiff's characterization of her symptoms as "uncontested," the ALJ's decision reflects that he considered her symptoms to determine whether they were supported by the medical evidence and concluded that he did not "find the claimant's statements regarding her limitations entirely consistent with the medial evidence and other substantial evidence" (A.R. 27). *See Suliman v. Saul*, No. 1:20-CV-11985-RWZ, 2022 WL 3108850, at *3 (D. Mass. Aug. 3, 2022) (finding that ALJ's RFC supported by substantial evidence where self-reported symptoms were inconsistent with the medical evidence).

Plaintiff also briefly asserts that her prior attorney erred in stipulating to the classification of Plaintiff's past work as "generally sedentary but actually performed light," which she alleges "weakens" her claim (Dkt. No. 8-1, at 25-26). In turn, she contends her counsel failed to argue, and the ALJ did not consider, that she performed work under special conditions for six to twelve months, which reflected subsidized employment not rising to the level of gainful activity (*id.*). The court finds this argument unavailing. "When a claimant is represented, the ALJ[] 'should ordinarily be entitled to rely on claimant's counsel to structure and present the claimant's case in a way that claimant's claims are adequately explored.'" *Faria v. Comm'r of Soc. Sec.*, No. 97-2421, 1998 WL 1085810, at *1 (1st Cir. Oct. 2, 1998) (quoting *Hawkins v. Chater*, 113 F.3d 1162, 1167 (10th Cir. 1997)). It was

ultimately her "burden to prove at Step 4 that she was unable to perform her past relevant work and an obligation to develop the record regarding the requirements of that work at the hearing." *Julianne P. v. Kijakazi*, No. 2:22-cv-00064-JDL, 2022 WL 17494867, at *2 (D. Me. Dec. 8, 2022), *report and recommendation adopted*, No. 2:22-CV-00064-JDL, 2023 WL 1785542 (D. Me. Feb. 6, 2023). Thus, the court's inquiry on this point ends here.

Finally, Plaintiff argues the ALJ erred in not adopting, in full, the medical opinions in this case in determining her RFC, suggesting that the ALJ simply "split the difference between the competing opinions" (Dkt. No. 8-1, at 23). While some courts have "rejected the idea that an ALJ is qualified to split the difference between expert opinions," the instant case is distinguishable. *Chantal E. v. Kijikazi*, No. 2:22-cv-00126-NT, 2023 WL 2806497, at *3 (D. Me. Apr. 6, 2023) (citing *Kaylor v. Astrue*, No. 2:10-cv-33-GZS, 2010 WL 5776375, at * 4-5 (D. Me. Dec. 30, 2010), *aff'd*, 2011 WL 487844 (D. Me. Feb. 7, 2011)). This is so because, as recognized by the *Chantal* court, it is permissible for the ALJ to "split the difference" between medical opinions, so to speak, where "it is reasonably clear that the ALJ did not do so based on his own interpretation of the medical evidence," but rather based on "a permissible crediting of Plaintiff's subjective complaints." *Id*. at *4 (citations omitted). Here, the ALJ explained his reasons for finding Dr. Campion's opinion that Plaintiff remained disabled and unable to work "due to an ongoing medical issue" unpersuasive, and the opinions of Drs. Hom and Truong limiting Plaintiff to light work to be "partially persuasive" (A.R. 25-26). He explicitly found that "[w]hile

treatment and notation of [l]upus is minimal from the alleged onset date through the date last insured, . . . this impairment supports a sedentary work capacity given [the Plaintiff's] subjective complaints . . . of fatigue and weakness caused by [l]upus" (A.R. 23-24). Accordingly, the court finds that the ALJ permissibly relied on Plaintiff's subjective complaints of fatigue and pain rather than impermissibly interpreted raw medical data.

Moreover, even if the ALJ had committed error in settling on an RFC falling between Dr. Campion's and the state agency examiner's opinions, any such error would be harmless because the RFC he adopted was more restrictive than that identified by the state agency examiners. *Smith v. Berryhill*, 370 F. Supp. 3d, 282, 289 (1st Cir. 2019) (finding any error harmless where the plaintiff's treating provider assessed the plaintiff as "disabled for the foreseeable future," while two non-examining State agency doctors opined that the plaintiff was capable of light work because "[t]he ALJ adopted essentially all of the limitations identified by the State agency doctors . . . [and] also set some restrictions that went beyond those identified by the State agency physicians, . . . limitations that offered [the p]laintiff a more restrictive RFC . . . [including] sedentary instead of light work"). *See also Betancourt-Guadalupe v. Bisignano*, No. 25-1645, 2026 WL 1643240, at *1 (1st. Cir. June 3, 2026) (citing *Smith* favorably in connection with its finding that the appellant before it had failed to show prejudice). Under these circumstances, remand would be no more than an empty gesture and is unwarranted.

D. Plaintiff's Argument That the ALJ Imposed the Incorrect Evidentiary Standard Is Without Merit

Lastly, Plaintiff contends that the ALJ incorrectly imposed upon her a "higher evidentiary standard of proof, presumably clear and convincing rather than the preponderance of evidence" (Dkt No. 8-1, at 27). Plaintiff's argument does not cite to any portion of the ALJ's decision where he allegedly applied the incorrect evidentiary standard. Instead, Plaintiff's argument is based entirely on her interpretation of two sections of the Social Security Administration regulations—20 C.F.R. §§ 404.708 & 404.709—which she misreads to argue that the ALJ applied the incorrect standards. The error in Plaintiff's analysis is that both sections on which she relies are contained within Subpart H, which relates "to evidentiary requirements for establishing an initial and continuing right to monthly benefits and for establishing a right to lump-sum death payment." 20 C.F.R. § 404.1(h). The determination of disability, however, is governed by Subpart P of the Social Security Administration's regulations, 20 C.F.R. §§ 404.1501-404.1599, and the regulations explicitly provide "[e]videntiary requirements relating to disability are contained in subpart P." *See* 20 C.F.R. § 404.1(p) ("Subpart P relates to the determination of disability or blindness."). Thus, because the regulations on which Plaintiff relies explicitly do not apply to her disability benefits claim, her argument is without merit and requires no further consideration here.

## IV. CONCLUSION

For the foregoing reasons, the court GRANTS the Commissioner's motion to affirm (Dkt. No. 10) and DENIES Plaintiff's motion for judgment on the pleadings (Dkt. No. 8). The Clerk's Office may close the case.

It is so ordered.

Date: September 10, 2026

/s/ Christopher L. Morgan
CHRISTOPHER L. MORGAN
U.S. MAGISTRATE JUDGE